No. 99-167

IN THE SUPREME COURT OF THE STATE OF MONTANA

2000 MT 15

298 Mont. 91

994 P. 2d 1098

---

MADISON RIVER R.V. LTD.,

a Montana corporation,

Petitioner and Appellant,

v.

THE TOWN OF ENNIS, a Montana corporation,

separately, and by and through its Town Council,

Respondent and Respondent.

---

APPEAL FROM: District Court of the Fifth Judicial District,

In and for the County of Madison,

Honorable James E. Purcell, Judge Presiding

COUNSEL OF RECORD:

For Appellant:

Robert T. Cummins, Attorney at Law, Helena, Montana

For Respondent:

J. Robert Planalp, Attorney at Law, Bozeman, Montana

_____

Submitted on Briefs: December 22, 1999

Decided: January 20, 2000

Filed:

_____

Clerk

Chief Justice J. A. Turnage delivered the Opinion of the Court.

¶1.Madison River R.V. Ltd. (R.V.) seeks to build a recreational vehicle park in Ennis, Montana. The Ennis Town Council denied R.V.'s application for preliminary subdivision plat approval, and the Fifth Judicial District Court, Madison County, upheld that decision. R.V. appeals. We affirm.

¶2.We restate the issues as follows:

¶3. Did Councilman Bob Kensinger's participation in the Town Council's deliberation and vote on R.V.'s subdivision proposal constitute error?

¶4. Were the Town Council's findings of fact and order timely and thus properly part of the record for the District Court's review?

¶5. Did the court err in upholding the Town Council's denial of R.V.'s application?

¶6. Did the court err in ruling that R.V. has not stated a claim for inverse condemnation for which relief could be granted?

¶7.In April of 1998, R.V., a Montana corporation, applied to the Town of Ennis, Montana, for preliminary plat review and approval of its plans to build a campground with space for

73 recreational vehicles on the bank of the Madison River at the east end of town. The first step in the Town's review of the preliminary plat was a public hearing before the Ennis Planning Board. At the hearing, which was continued to a second date to allow more information to be collected, the Planning Board heard testimony from the project engineer, the project proponent, and the County Planner. The Board also heard testimony from the Madison County Sanitarian regarding the project's potential effect on the Town's sewer system, and considered a letter from the Montana Department of Transportation concerning potential traffic problems posed by a relocation of the bridge spanning the Madison River adjacent to the proposed project.

¶8.The Planning Board unanimously recommended that the application be denied. It deemed the application incomplete in several respects. Planning Board members also cited concerns over the project's incompatibility with the primary goals of the Ennis Comprehensive Plan, the possible effects of formaldehyde entering the Town's sewer system from the dump station proposed as part of the project, and traffic safety problems.

¶9.The application was then considered by the Ennis Town Council. Before a public hearing was held, R.V. requested in writing that Councilman Bob Kensinger recuse himself from proceedings relative to the application. This request was based upon Kensinger's alleged bias against the proposed project. However, Kensinger did not recuse himself, and the other Town Council members did not object.

¶10.The Town Council considered the minutes of the Planning Board meeting, additional testimony by the project engineer and others, and public comments and letters. At the end of the hearing, the Town Council voted three to one to deny the application.

¶11.R.V. petitioned for appeal in District Court pursuant to § 76-3-625(2), MCA. Fifteen days later, and thirty-six days after the Town Council voted to deny the application, the council members signed written findings pursuant to the requirement of § 76-3-620, MCA, which provides that "a governing body may not deny or condition a subdivision approval under this part unless it provides a written statement to the applicant detailing the circumstances of the subdivision denial or condition imposition." Those findings were included in the record considered by the District Court.

## Issue 1

¶12.Did Councilman Bob Kensinger's participation in the Town Council's deliberation and

vote on R.V.'s subdivision proposal constitute error?

¶13.R.V. alleges that the Town Council should have disqualified Kensinger from voting and that the District Court should have vacated the Council's decision as a result of Kensinger's participation. R.V. states that "[t]he record is replete with evidence of councilman Kensinger's prejudice, bias, and predetermination of the issue of this application." It alleges, moreover, that Kensinger may have had an economic interest in assuring that the project would not be approved.

¶14.R.V. cites the principle that one who makes decisions in a judicial or quasi-judicial capacity must be free from bias, prejudice or preconceived determination of the issues. It cites no authority, however, that this principle applies to elected members of a city council. In fact, this principle is the antithesis of our political process, in which candidates run for election based on espoused political platforms and on promises of what they will do--if elected--concerning various issues of public interest.

¶15.To prevail on a claim of prejudice or bias against an administrative decision maker, a petitioner must show that the decision maker had an "irrevocably closed" mind on the subject under investigation or adjudication. *See Federal Trade Commission v. Cement Institute* (1948), 333 U.S. 683, 701, 92 L.Ed. 1010, 1034, 68 S.Ct. 793, 803. In *FTC*, the Court upheld a ruling that members of the Federal Trade Commission, who entertained views as a result of their prior ex parte investigations that a cement pricing system was the equivalent of price fixing in violation of the Sherman Act, were not thereby disqualified from presiding in an unfair trade proceeding concerning the cement pricing system.

¶16.Here, the District Court thoroughly reviewed the transcript of the hearings before the Planning Board and determined that nothing Kensinger said indicated that his mind was irrevocably closed on the subject of the proposed subdivision. The court noted that at the first Planning Board meeting, Kensinger stated he had "uncertainties" about the project. He "questioned" whether the Town sewer system could support the proposed 73-vehicle recreational vehicle park, whether the developer would pay for problems he guaranteed would never occur, and whether the subdivision could ultimately result in a higher tax burden for the people of Ennis. The District Court stated, "While Commissioner Kensinger did express doubts about the subdivision's effects on Ennis, these expressions of uncertainty are evidence that his mind was anything but irrevocably made up on the subject."

¶17.R.V. also claims that Kensinger may have had a financial interest in the denial of its application. It has attached to its brief a copy of a letter from a Bozeman, Montana, attorney addressed to its own attorney. The letter stated that the Bozeman attorney had been retained by "a group of individuals who are interested in making an offer to purchase the river property," and inquired as to R.V.'s interest in such an offer. A handwritten note at the bottom indicated that a copy of the letter had been sent to Kensinger. However, the writer of the handwritten note is not identified and nothing in the letter or the handwritten note states or implies that Kensinger is a member of the group interested in purchasing the property. Thus, R.V. has not supported its contention that Kensinger had a financial interest in the denial of its application.

¶18.We agree with the District Court that Kensinger's statements do not indicate that he had an irrevocably closed mind on the subject of the park application. R.V. has not established in any other way that Kensinger had an irrevocably closed mind on the subject. We affirm the District Court's determination that the Town Council was not required to disqualify Kensinger from voting and the court's decision not to vacate the Town Council's decision because of its failure to disqualify Kensinger.

Issue 2

¶19.Were the Town Council's findings of fact and order timely and thus properly part of the record for the District Court's review?

¶20.Section 76-3-625, MCA, provides the basis for R.V.'s appeal. The statute provides, in pertinent part:

A party . . . who is aggrieved by a decision of the governing body to approve, conditionally approve, or disapprove a proposed preliminary plat or final subdivision plat may, within 30 days after the decision, appeal to the district court in the county in which the property involved is located. The petition must specify the grounds upon which the appeal is made.

Section 76-3-625(2), MCA.

¶21.R.V. asserts that the Town Council's findings should not be included in the record on appeal because they were prepared 15 days after it filed the appeal and "four days beyond the time for appeal." R.V.'s time calculations are flawed. As stated above, § 76-3-620,

MCA, requires that a decision to deny a subdivision application must include a written statement giving the reason for the denial. The thirty days allowed for appeal under § 76-3-625(2), MCA, did not begin to run until the Town Council members signed the written findings required under § 76-3-620, MCA. The fact that R.V.'s notice of appeal to District Court was prematurely filed does not render untimely the written statement of reasons for the denial of R.V.'s application for preliminary plat approval.

¶22.We hold that the Town Council's findings were timely and were properly a part of the record for the District Court's review.

Issue 3

¶23.Did the court err in upholding the Town Council's denial of R.V.'s application?

¶24.Under this issue, we have grouped several arguments raised by R.V. The first deals with R.V.'s complaint that it was denied due process as a result of the failure of the District Court to hold a hearing.

¶25.Early on in the District Court proceedings, R.V. argued that neither discovery nor jury trial were permissible in this matter, which it characterized as an appeal on the record. At a November 24, 1998 scheduling conference, however, the parties agreed to a nonjury trial, and the District Court set an April 1999 trial date. Thereafter, R.V. again objected to a discovery request by the Town of Ennis on the basis that "[d]iscovery is not allowed as no additional evidence is permitted on a judicial review, which is based solely on the record."

¶26.The record from the proceedings before the Town Council was submitted to the District Court on December 30, 1998. R.V. filed an acknowledgment of receipt of a copy of the record and a document stating that it did not anticipate calling any witnesses in this matter, "as this is an appeal on the record." On February 17, 1999, the District Court filed its written decision based on the record which had been submitted to it.

¶27.That the court issued its decision in February 1999 without holding a hearing in this matter can only be explained as a result of the position taken by R.V. as outlined above, and events not wholly of record. R.V. has appended to its brief a copy of a December 22, 1998 letter from the court to counsel for both parties. That letter describes the court's uncertainty about the procedural posture of the case and proposes a telephone conference call between the parties and the court on December 29, 1998, to discuss that matter.

Neither party has submitted anything to this Court concerning the results of that call, nor does the District Court record contain any reference to or record of the telephone conference call.

¶28.R.V.'s argument on appeal that a hearing should have been held conflicts with the position it took in the proceedings in District Court, as described above. We conclude that given the position it took below, R.V. is precluded from now arguing that the District Court deprived it of due process by reaching its decision without holding a hearing.

¶29.R.V. next argues that the proper standard of review for this appeal is whether the Town of Ennis's decision and the District Court's review thereof are supported by substantial credible evidence. R.V. argues that the arbitrary and capricious standard of review set forth at § 76-3-625(1), MCA, applies only to actions for damages under the statute.

¶30.The Town of Ennis persuasively counters that even if the standard of review set forth in § 76-3-625(1), MCA, does not govern here because this is not an action for damages, the same standard of review applies under a different rationale--the standard of review of decisions of administrative agencies in the legislative branch of government. *See North Fork Preservation Ass'n v. Department of State Lands* (1989), 238 Mont. 451, 458-59, 778 P.2d 862, 867 ("the standard of review to be applied by the trial court and this Court is whether the record establishes that the agency acted arbitrarily, capriciously, or unlawfully"). We agree, and we will examine the merits of the Town Council's decision to determine whether it was arbitrary, capricious, or unlawful.

¶31.R.V. argues that the decision to deny its application cannot be based on a conflict with the Town's comprehensive plan, because the Town's zoning regulations allow its property to be used as a campground. Although zoning regulations permit use of this piece of property as a campground, under § 76-3-604(1), MCA, the proposed use must also comply with the Ennis Comprehensive Plan. The primary goals of that plan include preserving and enhancing community attractiveness and conserving the area's natural and environmental quality. Both the Council and the Planning Board heard testimony that the proposal for 73 recreational vehicle spaces in six rows on less than ten acres of land would detract from the attractiveness of the community of Ennis.

¶32.R.V. points out that there was no definitive professional testimony that its proposed recreational vehicle park would cause organic overloading of the Town's sewage treatment

lagoon. There was, however, considerable testimony raising serious questions about the effect of adding a recreational vehicle park's waste to the Town's sewage treatment system.

¶33.The Town's engineer described his waste water flow monitoring in the Town's sewer system. He collected data showing total water flows greater than the capacity of the sewer system, leading him to conclude that the Town's sewage treatment lagoon was already hydraulically overloaded. He informed the Town Council that the type of discharge permit possessed by the Town was under review by the Department of Health and Environmental Sciences and the Department of Environmental Quality. He stated that a strong possibility existed that additional restrictions would soon be placed on the amount of nutrients that could be discharged into state waters such as the Madison River under such permits.

¶34.The Town's engineer further stated that holding tanks for recreational vehicles are more biologically loaded than residential sewer discharge. The engineer for R.V. admitted that the waste water from recreational vehicles is stronger than household waste and that care must be taken to avoid "shock loading" of sewage treatment systems by such waste. An environmental engineer specialist submitted a letter discussing the potential effect of septage (waste that has no dissolved oxygen in the waste water) from recreational vehicle tanks on the Town's waste water lagoon. The environmental engineer specialist stated that one load of septage from a recreational vehicle is equivalent to the organic load from about 456 people in a very short time. Ennis's lagoon was not designed for this type of shock load. Septage can contribute to organic overload, odors, and permit violations.

¶35.R.V. also objects to the inclusion in the record of a letter from Patrick A. Byroth, a fisheries biologist with Montana Fish, Wildlife & Parks. Although the letter is dated on the date of the Town Council hearing, it bears a "Received" stamp showing a date several days after the hearing.

¶36.The transcript of the hearing before the Ennis Town Council reveals that Town Attorney J. Robert Planalp introduced the letter from Byroth at the hearing and asked that it be read into the record. The letter was discussed at the hearing and was given to the Town Council, but it was not formally offered as an exhibit. Near the close of the hearing, R.V. was given an opportunity to rebut all of the opposition comments made during the hearing. R.V. did not object to inclusion of the letter in the record then, nor did it object to the District Court that the letter should not have been included. We hold that R.V. has not established error as a result of including the Byroth letter as part of the record, despite its

postdated "Received" stamp.

¶37.In his letter, Byroth stated that his Department had received information indicating that sewage from the proposed recreational vehicle park may overwhelm the Town of Ennis's sewage treatment system and enter the Madison River. He stated that formaldehyde from recreational vehicle holding tanks could further exacerbate such problems, degrade water quality, and harm the fishery.

¶38.The Town Council also heard testimony from a number of citizens, the clear majority of whom opposed the proposal. In addition to concerns about overloading the capacity of the Town's sewage treatment system, they objected on grounds of increased risk to children using a park across the street from the proposed project in light of the foreseeable increased traffic, and potential added expense to taxpayers as a result of discharge from the recreational vehicles into the Town's sewage system and the Madison River.

¶39.A preliminary plat of a proposed subdivision is subject to the review of the governing body to determine whether the plat conforms to the master growth plan adopted for the area and the plat's effects on the public health, safety, and welfare. Sections 76-3-604 and -605, MCA. The record of the proceedings before the Ennis Town Council establishes that the Town Council heard evidence that the proposed recreational vehicle park did not conform to the goals of the Ennis Comprehensive Plan. In addition, the Town Council heard evidence that the proposed recreational vehicle park posed a threat to the health, safety, and welfare of the townspeople of Ennis. We hold that the Town Council's decision to deny R.V.'s preliminary subdivision application was not arbitrary, capricious, or unlawful. We further hold that the District Court did not err in affirming that decision.

Issue 4

¶40.Did the court err in ruling that R.V. has not stated a claim for inverse condemnation for which relief could be granted?

¶41.R.V.'s petition to the District Court included a claim that "denial of the project amounts to an inverse condemnation of the Petitioner's property without just compensation having been paid and is contrary to the Montana and United States Constitutions." The court dismissed this claim on grounds that R.V. had not alleged facts from which the court could find it had suffered a taking at the hands of the Ennis Town Council.

¶42. R.V. argues on appeal that no evidence was presented to the District Court as to the claim of inverse condemnation and that, therefore, the court should not have ruled on that claim. R.V. takes the position that it withdrew the inverse condemnation claim from the District Court's consideration, so that it could be pursued separately in the future. However, R.V. did not expressly withdraw this claim; withdrawal must be inferred from R.V.'s motion and brief to strike certain of the Town's defenses because this is "not an action for money damages."

¶43. The District Court's decision amounts to a judgment on the pleadings on the claim for inverse condemnation. The court stated:

[R.V.] has not alleged facts from which this Court could find it has suffered a taking at the hands of the Ennis Town Commission. The Montana Supreme Court has stated that "a regulatory taking of property by a municipality is allowed even if the value of that property and its usefulness is diminished." Kudloff v. City of Billings, 260 Mont. 371, 860 P.2d 140 (1993) citing Penn Central Transp. Co. v. New York City, 438 U.S. 104 (1978). The Court went on to say, "It is only when the owner of the real property has been called upon to sacrifice all economically beneficial use of that property in the name of the common good that a constitutionally-protected taking has occurred." Id. citing Lucas v. South Carolina Coastal Council, 505 U.S. 1003 (1992). There is nothing in the record to suggest, nor has [R.V.] alleged, that the effect of the Commission's denial of its application for an RV park is to deny all economically beneficial use of the property in question. Therefore with regard to inverse condemnation, [R.V.] has not stated a claim for which relief can be granted.

¶44. The determination that R.V. failed to state a claim for inverse condemnation on which relief could be granted is a conclusion of law. *See Boreen v. Christensen* (1994), 267 Mont. 405, 408, 884 P.2d 761, 762. This Court's standard of review of a district court's conclusion of law is whether the court's interpretation of the law is correct. *Steer, Inc. v. Department of Revenue* (1990), 245 Mont. 470, 474-75, 803 P.2d 601, 603. We see no error in the court's interpretation of the law. Given R.V.'s inconsistent and confusing procedural position before the District Court, we further find no error in the court's entry of a judgment on the pleadings as to this claim. We hold that the District Court did not err in ruling that R.V. has not stated a claim for inverse condemnation on which relief could be granted.

¶45. Affirmed.

/S/ J. A. TURNAGE

We concur:

/S/ KARLA M. GRAY

/S/ TERRY N. TRIEWEILER

/S/ JIM REGNIER

/S/ W. WILLIAM LEAPHART